**J.S. LINCOLN, et al., Plaintiffs,**

v.

**REPUBLIC ECOLOGY CORP., et al., Defendants.**

**No. CV 89–4422–RJK.**

United States District Court, C.D. California.

March 26, 1991.

Irell & Manella, Gregory R. Smith, Henry Shields, Jr., Albert M. Cohen, Los Angeles, Cal., for plaintiffs.

Cutler and Cutler, Paul R. Salerno, John Baldwin Hassler, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

This is an action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and other statutory and common law theories of liability. By this action, various parties seek to recover costs for the remediation of hazardous substances discovered on property in the City of Pasadena.

We are here concerned with third-party defendant City of Pasadena's motion for summary judgment by which it seeks to avoid liability as an "arranger" of hazardous substances pursuant to CERCLA § 107(a)(3).[1] Third-party plaintiff Helen E. Monroe (Monroe), who at times has both owned the property in question and has operated at that location an automobile dismantling and salvage business known as

**1.** CERCLA § 107(a)(3) imposes liability on any person who arranges for the disposal or treatment of hazardous substances at the facility in question, or arranges for the transport of such hazardous substances for disposal or treatment. 42 U.S.C. § 9607(a)(3). CERCLA § 113(f) provides a cause of action for contribution from any person who is liable or potentially liable under section 107(a) of the statute.

Monroe Auto Wrecking (MAW), seeks contribution from the City of Pasadena (City) because the City established ordinances regulating and authorizing private towing and salvage companies to remove abandoned vehicles from public and private property.

The City brought this motion for summary judgment on October 1, 1990,[2] claiming that as a matter of law, it could not be held liable as an arranger under the terms of CERCLA § 107(a). At the October 1, 1990 hearing on the motion, Monroe expressed a need to conduct further discovery as to whether certain City-owned vehicles delivered to the site contained hazardous substances. This Court continued the hearing until February 4, 1991, to allow the parties time for any additional discovery.

At the February 4th hearing, the Court took the matter under submission after reviewing the pleadings and hearing oral arguments of counsel. For the reasons set forth below, the Court now GRANTS the City's motion for summary judgment. The Court holds that the City's involvement was nothing more than a non-contributory exercise of its sovereign power to abate public nuisances created by the presence of abandoned vehicles on public or private property. The undisputed facts demonstrate that the City's regulatory conduct does not, as a matter of law, give rise to CERCLA "arranger" liability under § 107(a)(3).[3]

Pursuant to certain state provisions, the City created separate programs to deal with (1) abandoned vehicles located on private property, and (2) abandoned vehicles left on public property.[4]

Pasadena's Abandoned Vehicle Abatement Ordinance No. 5242 (Ordinance) authorizes the City Housing Administrator to cause the removal of abandoned vehicles located on private property. Such vehicles are expressly acknowledged to constitute a public nuisance.

The City's Maintenance Assistance Services for Homeowners (MASH) unit implements the Ordinance through the Abandoned Vehicle Abatement (AVA) program. Under this program, citizens direct their complaints concerning abandoned vehicles on private property to MASH and fill out information forms. MASH employees then verify the vehicles' locations and inspect their conditions. MASH then transmits the vehicles' identification information to the City Police Department (Police) who determines if the vehicles are stolen or subject to outstanding warrants. MASH takes no further action until it receives Department of Motor Vehicles (DMV) print outs from the Police. If the vehicles are stolen or subject to warrants, the Police take over the matter.

If the vehicles are not stolen or subject to warrants, MASH mails notice to the vehicle owners and the owners of the property where the vehicles are located. MASH may or may not mail second notices.

2. The City originally brought a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court ordered that the motion to dismiss be converted into a summary judgment motion, and continued the hearing on the matter until October 1, 1990.

3. Additionally, the fact that the City sent vehicles to MAW does not subject the City to liability under the facts of this case.

4. California Vehicle Code § 22669 authorizes cities to remove "abandoned" vehicles from highways or from public or private property. California Vehicle Code § 22671 authorizes cities to issue a franchise or execute a contract for the removal of such vehicles. In order to implement the state statute, cities are authorized to adopt an ordinance "establishing procedures for the abatement and removal, as public nuisances, of abandoned, wrecked, dismantled, or inoperative vehicles or parts thereof from public or private property...." Cal.Veh.Code § 22660. The ordinance must incorporate various notice and other requirements as specified by the state statute. Cal.Veh.Code § 22661.

A vehicle towed pursuant to these provisions must be temporarily stored pending completion of the notice requirements. The towing or salvage facility obtains a lien for its services which may be satisfied by a subsequent sale of the vehicle. Cal.Veh.Code § 22851, Cal.Civ.Code §§ 3067–3075. The towing service is deemed to take possession of the abandoned vehicle upon removal from the abandonment site. Cal.Veh. Code § 22851, Cal.Civ.Code § 3068.1. The last registered owner is presumed liable for the cost of removal and disposition of the vehicle. Cal. Veh.Code § 22524(a).

MASH then posts notices on the vehicles themselves.

If all notification attempts fail to result in the vehicles' abatements, the City authorizes a towing service to remove them. Since about 1985, MASH has been referring AVA vehicles to Monroe Auto Wrecking (MAW) for towing. MAW picks up the vehicles and thereafter controls their ultimate disposition, subject only to certain holding time and release requirements which apply if the owners appear or are likely to come forward to claim their vehicles.

The City does not pay MAW for this service; rather, MAW recovers its costs either directly from owners who reclaim their vehicles or through the sale of scrap parts. Once vehicles are dismantled, MAW verifies that they have been destroyed and notifies the DMV of this fact. It appears that from 1985 to present, MAW towed over 900 cars to the Property on the City's behalf.

The City has also created an Impounded Vehicle Program to deal with vehicles left on public streets. Pursuant to this program, the Police authorize the removal of such vehicles if they sit for over 72 hours or if they lack the necessary parts to be operated safely. The City has adopted a Police policy which sets forth procedures for impounding these vehicles. Thus, when citizens complain or police officers identify abandoned vehicles on public streets, the vehicles are tagged and may be towed if not removed within 72 hours.

The Police try to contact the owners. If this fails, the Police dispatcher contacts the City towing service. The Police then fill out the appropriate impound forms to authorize the removal of the vehicles by the towing service. This ends the City's involvement with the vehicles.

The only towing services under contract with the City are S.N. Ward & Son (a party in this case) and Johnnie's Towing. These are the only services that the police dispatcher contacts to impound vehicles from public streets. Although S.N. Ward & Son towed some vehicles to MAW between 1987 and 1989, this arrangement existed solely between those two entities. The City does not have any contractual or other arrangements with MAW with respect to impounded vehicles.

In 1987 and 1988, MAW received 738 vehicles pursuant to this program.[5]

Independent of the above two programs, from 1983 to the present, the City gave or sold about 28 wrecked or used City-owned vehicles for salvage to MAW.

CERCLA's legislative history, the emerging court decisions and public policy support the conclusion that the City's involvement in the disposal of hazardous substances was not sufficient to subject it to CERCLA liability in this case.

The legislative history behind CERCLA strongly suggests that Congress intended to force those who (1) benefit *financially* from transactions involving hazardous substances, or (2) directly cause or contribute to a release, to internalize the environmental costs associated with the proper disposal of such substances. This intent is strongly evidenced by CERCLA's imposition of strict liability on parties who generate, transport, dispose of or otherwise handle hazardous substances that are subsequently released into the environment. It is also evidenced by Representatives' and Senators' statements and in House and Senate Reports.[6]

Thus, an unmistakable purpose behind CERCLA's strict liability standard was to force the parties who *profit* from the use and generation of hazardous wastes, or directly cause or contribute to their release,

---

**5.** It also appears that overall, MAW received about 75% of its inventory pursuant to the Abandoned Vehicle and Impounded Vehicle programs.

**6.** For example, Representative Jeffords noted that CERCLA's combination of a tax on generators and strict liability for site remediation

"places the costs of releases of hazardous wastes on the sector most responsible for pollution and which benefits most from chemical production, rather than on the victim *or taxpayers.*" 126 Cong.Rec. H11799 (daily ed. Dec. 3, 1980) (emphasis added).

to account, in the pricing of their products, for the environmental externalities associated with improper disposal.

This rationale simply does not apply to the City's abatement of public nuisances. Imposing liability on the City in this case would shift the burden caused by the handling practices of salvagers to city taxpayers in contravention of congressional intent.

Because cities or other government entities may be directly involved in the generation, use, handling and disposal of hazardous substances, CERCLA does include them within the definition of potentially responsible "persons". 42 U.S.C. § 9601(20)(D). However, state and local governments enjoy certain "special exemptions" from liability. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 2280, 105 L.Ed.2d 1 (1989).

One such exemption, § 101(20)(D), excludes from the definition of owner or operator "a unit of State or local government which acquired ownership or control involuntarily through abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign." 42 U.S.C. § 9601(20)(D).[7] Hence, it is very likely that Congress, consistent with the imposition of strict liability, did not intend to expose government entities to cost recovery actions of this kind, where such entities are merely performing sovereign functions.[8]

Congressional intent to shield government entities from liability in some cases is further evidenced by § 107(d)(2), which provides that no state or local government shall be liable under CERCLA as a result of actions taken in response to an emergency created by the release or threatened release of hazardous substances generated by or from a facility owned by another. 42 U.S.C. § 9607(d)(2). This exemption indicates that Congress intended to exclude from liability a state or local government which responds to non-CERCLA public health and environmental nuisances.

Congress could not possibly conceive of every specific circumstance in which a government entity might be included within the broad reach of CERCLA in carrying out sovereign functions unrelated to hazardous substances. Yet the purposes behind the strict liability standard and the two statutory exemptions mentioned above provide substantial evidence that Congress intended to exclude such non-negligent, but state authorized, activities from strict liability.

While the courts have extended the reach of CERCLA § 107(a)(3) liability quite far up the chain of parties involved in hazardous substances transactions, the courts have also been consistently circumspect about imposing "arranger" liability on more remote parties, especially government entities who, like Pasadena, exercise minimal or involuntary control over the disposition of hazardous substances. The emerging trend seems to exclude claims of this nature against municipalities.[9]

---

7. The terms "owner" and "operator" are normally used in connection with § 107(a)(1) and (2) liability for the facility where hazardous substances were released. However, the rationale behind this exclusion applies equally well to the imposition of "arranger" liability on the City under § 107(a)(3) for any temporary custodial relationship it might be deemed to have exercised over impounded or abandoned vehicles. Indeed, the definition of "facility" under CERCLA expressly includes motor vehicles. 42 U.S.C. § 9601(9). Thus, to the extent that the City can be said to have acquired temporary "control" over abandoned vehicles, CERCLA arguably exempts the City from liability by its own terms.

8. In accordance with this purpose, the § 101(20)(D) exemption is lost if the city "caused or contributed to" the release or threatened release. However, Monroe has not been able to produce evidence that any of the City-owned vehicles caused or contributed to the release of hazardous substances.

9. The Supreme Court has not directly addressed the issue. In *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 2280, 105 L.Ed.2d 1 (1989), the Court was faced with the issue of whether CERCLA permits a suit for money damages against a state in federal court. Pennsylvania was sued as a third-party defendant as an alleged "owner or operator" of a hazardous waste site. The gist of Pennsylvania's defense was the Eleventh Amendment. The Court held that Congress intended the states to be liable along with everyone else for cleanup costs recoverable under CERCLA. *Id.* 109 S.Ct. at 2278. However, the Court said nothing about a state's

In *State of New York v. City of Johnstown*, 701 F.Supp. 33 (N.D.N.Y.1988), the court declined to impose § 107(a)(3) liability on the State of New York for its actions permitting or directing wastes to be placed in a particular facility after an alternative facility had been closed. The court held that to establish "arranger" liability, "it must be shown ... that the State owned or possessed the hazardous substances of which it arranged to dispose." *Id.* at 36. The court also required "some nexus between the allegedly responsible person and the owner of the hazardous substances before [the] party [could] be held liable." *Id.*

In *United States v. Dart Industries*, 847 F.2d 144 (4th Cir.1988), the Fourth Circuit affirmed a district court decision that applied a "sovereign function" distinction to dismiss a CERCLA cost recovery claim against the South Carolina Department of Health and Environmental Control (DHEC). The case involved the disposal of hazardous wastes at a contaminated landfill, and DHEC was brought into the case by virtue of its regulations concerning the site.

The court held the dismissal proper because there was "no allegation that DHEC went beyond this governmental supervision and directly managed [the site]." *Id.* at 146. The court also held that DHEC was not an owner or operator under § 101(20)(D) because the "generators [were] unable to specify any 'hands on' activities by DHEC that contributed to the release of hazardous wastes. The district court appropriately described DHEC's activities as merely 'a series of regulatory actions.'" *Id.*

In *United States v. New Castle County*, 727 F.Supp. 854 (D.Del.1990), a third-party CERCLA complaint was filed against the State of Delaware for its role in permitting a hazardous waste disposal site and approving the disposal at that site of certain wastes generated by others. The third-party plaintiffs sought to hold the State liable as an "arranger" because it directed or permitted wastes to be disposed of at the

site, arguing that actual ownership or possession is not a prerequisite to § 107(a)(3) liability.

The court rejected this argument. It thoroughly reviewed the reasoning of *Johnstown*, and found it to be persuasive. *Id.* at 872. The court concluded that under the facts of the case, the State of Delaware did not own or possess, either actually or constructively, any hazardous wastes that were disposed of at the site. *Id.* Ultimately, the court held that "to impose liability under § 107(a)(3), some nexus or relationship must be shown between the person alleged to be the arranger (here, the State) and the owner of the hazardous substance." *Id.*

The court noted that prior cases upholding potential liability required some sort of nexus or relationship between the public entity exercising its regulatory authority and the waste generators before liability could be imposed on the state:

> [T]his nexus or relationship was present due to the commercial relationship of the person fixed with arranger status (which in some instances was coupled with the actual control that person had over the hazardous wastes) and the hazardous wastes which were disposed. The nexus or relationship could be shown, depending on the facts of a particular case, in many ways, all in keeping with the broad remedial objectives of CERCLA. The State of Delaware was attempting to solve the problem of the safe disposal of wastes—some of which may be determined to be hazardous—a situation that is analogous to the State of New York in its attempt to remediate the hazardous waste problems at the sites in *Johnstown*. On the facts of this case, this is simply not the appropriate situation for the attachment of arranger status on the State.

*Id.* at 874 (footnotes omitted).

These cases support the principle that strict liability under CERCLA should not attach to government entities engaged in

potential liability as an "arranger" under § 107(a)(3). The case, therefore, adds nothing

new to the motion before this Court.

legitimate sovereign, as opposed to proprietary or commercial, functions. This is especially true when, as here, the City had no "hands on" involvement with or control over the hazardous substances and enjoyed no commercial interest or benefits by virtue of the regulatory legislation.[10]

In this case, it was the vehicle owners themselves or the owners and operators of the Property who had the authority to control the handling and disposal of any hazardous substances contained within the vehicles. The City is not a § 107(a)(3) "arranger" for purposes of CERCLA liability simply because it enacted legislation geared toward abating public nuisances in the form of abandoned vehicles, without any financial, commercial or proprietary interest in their abatement. Holding the City liable in this case would expose municipalities to liability under circumstances not contemplated by the statutes. The courts have heretofore declined to interpret CERCLA in such a manner, and this Court does so as well.

Public policy concerns also dictate that the City's motion be granted. First, it would be inconsistent with the congressional intent that the cleanup costs be absorbed by those entities who can best send proper price signals to the market—those who profit from transactions involving hazardous substances or cause their release. Second, if cities were held potentially liable under CERCLA each time they undertook to abate a public nuisance or engaged in a sovereign function which was, at best, remotely related to the ultimate disposition of hazardous substances into the environment, they would become quite reluctant to fulfill their statutory mandates to undertake legislation necessary to maintain a functional municipality. Finally, if liability is extended to cities in these circumstances, private parties engaged in hazardous substances transactions who actually cause or contribute to releases will have less of an incentive to operate their businesses in an environmentally sound manner.

As for the *de minimis* instances where the City gave or sold to Monroe vehicles owned by the City, Monroe has not offered evidence that any of those vehicles contained any hazardous substances prior to being transported to the Property. Monroe relies heavily on Mr. Donald Glaze's deposition. The City designated Mr. Glaze to testify as to the disposition of City-owned vehicles at the auto-wrecking yard. Mr. Glaze testified that between 1983 and 1990 when the 27 or 28 City-owned cars were turned over to MAW, there was no procedure for the fluids in the vehicles to be removed before being sent to the yard.

---

**10.** Monroe would like this Court to follow *United States v. Northeastern Pharmaceutical,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1988) (NEPACCO). In *NEPACCO,* the issue was whether corporate officers who were involved with the handling and disposal of hazardous wastes could be found personally liable under CERCLA without piercing the corporate veil. The corporate assets had already been liquidated and distributed to the shareholders, so it was unlikely that any recovery costs would come from corporate coffers.

In this context, the *NEPACCO* court expanded its interpretation of the term "possession" under § 107(a)(3) to include "the authority to control the handling and disposition of hazardous substances." *Id.* at 743. Using this interpretation, Monroe argues that since the municipal ordinances specify in great detail the procedures and circumstances for removing abandoned vehicles, the City had "authority to control" their removal and should therefore be held liable as an "arranger" under the test announced in *NEPACCO.*

Monroe's reliance on *NEPACCO* is misplaced. First, *NEPACCO* in no way involved municipal liability, but instead concerned the personal liability of a corporate officer who no one disputed was a potentially liable party. Second, in this case nothing in the ordinances and procedures suggest that the City had "control" over the generation, handling or disposal of hazardous substances; the only authority City employees had was to identify and facilitate the abatement of abandoned vehicles owned by other parties in accordance with the local ordinances.

In fact, the *New Castle* court expressly refused to apply the *NEPACCO* "authority to control" test to the State's actions in permitting and directing the disposal of hazardous wastes owned by others. The court noted that the critical facts in *NEPACCO* were both (1) the policy consideration of not allowing plant supervisors or corporate officers with control over hazardous substances to escape liability and (2) the existence of "a commercial, financial relationship" between the plant supervisor and the corporation. *New Castle,* 727 F.Supp. at 873.

However, it appears that all but 7–10 of the vehicles were stripped down to the metal via a "cannibalization" process. Mr. Glaze was unable to testify that any of the 7–10 remaining autos were not stripped, or that any of them contained fluids or even engines.

Aside from this deposition testimony, the only other evidence Monroe offers to support this aspect of her claim is that there were hazardous substances at the site. She has offered nothing additional regarding the *source* of these substances.

In opposing this motion for summary judgment, Monroe cannot rely on an absence of evidence to prove her case. Since she bears the burden of proof with regard to the City-owned vehicles, she must set forth specific facts showing that there is a genuine issue of material fact for trial on this issue.[11] It is clear from Monroe's supplemental oppositions that she will not be able to show that City-owned vehicles did indeed contain hazardous substances prior to being transported to the property. This is especially evident in light of the fact that Monroe was given four additional months of discovery and came up with nothing new. In short, under *Celotex Corp. v. Catrett*[12] and its progeny, Monroe has not met her burden of coming forward with evidence to create an issue of fact on that point.

As a matter of law, the City's involvement is not sufficient to subject it to CERCLA liability under § 107(a)(3). The City is doing nothing more than exercising its sovereign power to abate public nuisances created by the presence of abandoned vehicles on public or private property. As for the City-owned vehicles, Monroe has not set forth specific facts showing that there is a genuine issue of material fact for trial on this issue.

Based upon the undisputed facts and conclusions of law, this Court concludes that the moving party is entitled to summary judgment as a matter of law. Accordingly, the Court hereby grants the City's motion for summary judgment.

The Clerk shall send, by United States mail, a copy of this Memorandum of Decision and Order to counsel for all parties in this matter.

---

**11.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**12.** 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).